# In the United States Court of Federal Claims

No. 02-70 C
(Filed July 29, 2005)

*******************************

| | | |
|---|---|---|
| | * | Government contract case; Contract |
| THE FEDERAL GROUP, INC., | * | Disputes Act; summary judgment; |
| | * | non-appropriated fund instrumen- |
| Plaintiff, | * | tality ("NAFI"); contract for procure- |
| | * | ment of real property; "real property |
| v. | * | in being;" requirements contract; |
| | * | negligent estimates; superior |
| THE UNITED STATES, | * | knowledge; misrepresentation; |
| | * | agreement to aggressively market; |
| Defendant. | * | interference; mitigation of damages |
| | * | |

*******************************

*G. Lindsay Simmons*, Jackson Kelly, PLLC, Washington, D.C., for plaintiff.

*Andrew P. Averbach*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were *Bryant G. Snee*, Assistant Director, *Peter D. Keisler*, Assistant Attorney General, and *David M. Cohen*, Director.

## OPINION AND ORDER

Plaintiff, The Federal Group, Inc. ("FGI"), contracted with the Office of Personnel Management ("OPM") to design, construct, operate and maintain a facility for the Eastern Management Development Center ("EMDC"), one of two senior-level federal residential learning centers in the nation. The EMDC facility was built in Shepherdstown, West Virginia and has operated since late in Fiscal Year ("FY") 1998. The solicitation stated that "[a]t the EMDC, programs are conducted continuously throughout the year and consist primarily of two-week seminars on various organizational and topical subjects. One-week seminars, special educational programs and events, and other training and development services are also conducted." Appendix to Plaintiff's Brief ("Pl.'s Br.") at 3. The solicitation sought a campus-like

setting, off the beaten path, that would enable participants to focus upon the curricula offered and interact with other participants without significant distractions.

After amendments described herein, the lease contract was awarded to FGI. The facility was constructed and is owned by FGI.  OPM rents space in the facility for training and, as set forth in more detail herein, after a government training session commences, previously reserved but unused rooms are released to FGI.   FGI , which also operates under franchise with Clarion Hotels, offers to the public rooms not reserved by OPM.

FGI alleges that OPM negligently estimated its training requirement, and during the solicitation and bidding process, OPM failed to disclose relevant information thereby violating the superior knowledge doctrine and its obligation to provide accurate attendance projections.  It is claimed that OPM failed to disclose significant decreases in attendance at the prior EMDC location, a trend that was expected to continue downward, and failed to inform FGI of OPM's then unpublicized efforts to implement regulatory changes that would end the EMDC's virtually monopolistic position, thus subjecting the training center to competition from the private sector for the first time.  FGI also asserts OPM breached an amendment to the solicitation wherein it agreed to aggressively market the center so as to increase attendance to levels originally touted, and breached the implied duty to cooperate and/or the duty of good faith and fair dealing by failing to work toward the resolution of the underutilization of the EMDC by not timely releasing unsold rooms so that FGI could mitigate its asserted losses by marketing the rooms to the public.  Finally, FGI contends it did not waive its right to annual price adjustments.  Damages of $3,934,316 are sought.  The court held a hearing on cross-motions for summary judgment on March 2, 2005.

## Facts

On October 26, 1995, OPM issued contract solicitation OPM-SFO-95-01575 for the design, construction, operation, and maintenance of EMDC, a state-of-the-art residential learning facility to train senior government managers. Pl.'s App. at 1-78. The solicitation was for a 24,100 square feet training center, lodging  for 210 (later reduced to 168) attendees and faculty, food service and dining facilities for 250 persons, and parking and athletic facilities.  *Id*. at 3-4.  The bulk of the programs contemplated would be two-week seminars.  *Id.* at 4.  The facilities and services would

be provided under a ten-year contract with two five-year options. *Id.* OPM's initial estimate was for 210 rooms for 23 two-week cycles of five courses per cycle. *Id.* at 4, 9. With maximum attendance (42 participants and guest faculty per course per cycle) at all five courses in each of the eleven-night sessions there would be 53,130 "room-nights.[1]" *Id.* at 9; *see also* Plaintiff's Brief in Support of Its Cross-Motion for Summary Judgment ("Pl.'s Br.") at 7. "The service elements of the offeror's offer must demonstrate the capacity to assure the continuation of the offered services for the life of the lease." *Id.* The food and lodging quantities were estimated maximums.[2] Offers made would include all service charges and gratuities.

The solicitation also set the procedure for OPM to book hotel space as well as the procedure for releasing space to FGI for marketing to the public.[3] At the end of

---

[1] A "room-night" is a single overnight stay by one hotel guest.

[2] Paragraph 4.3 of the solicitation stated, in part:

> The quantities shown for food and lodging rooms are estimates. The Offerors must submit a price offer for lodging an estimated maximum 210 participants and guest faculty per night during each of 23 two-week cycles per year. The food service estimate will be based on an estimated 250 person daily maximum during each scheduled two-week cycle . . . . These are maximum/anticipated numbers for the duration of the lease unless the expansion clause is exercised. It should be understood that in some fiscal years, national holidays and other events occur which could lower the number of sessions to 21 or 22 two-week sessions. It should also be understood that not all periods will require the maximum of 210 persons staying overnight or 250 persons dining each day in a particular seminar cycle. One-week seminars and other programs may also be scheduled resulting in a requirement for additional room nights . . . . Prices offered must include all service charges and gratuities.

Pl.'s App. at 9.

[3] Paragraph 4.3.1 of the solicitation stated, in part:

> The fiscal year for the Federal Government runs from October 1 to September 30. Each year, during the fourth quarter of the fiscal year, the EMDC determines its schedule for the upcoming year. Once this schedule has been set, the EMDC will

(continued...)

the fiscal year, the EMDC would approximate the number of seminars planned for the upcoming year and communicate that information to the successful bidder (the lessor). Pl.'s App. at 9-10. A "projected estimate" would be provided three days before the seminar begins with a "final guarantee" on the morning of the second day of the seminar. *Id.* As provided under "Special Lease Requirements," "[a]t least one week prior to the scheduled activity, OPM will notify the lessor of the number of participants, guests, visiting faculty etc. expected for each seminar and will furnish a participant roster showing the names of the participants scheduled to attend." *Id.* at 76. "OPM may cancel scheduled seminars by giving the lessor written notice at least 28 calendar days in advance of the date the seminar is to begin." *Id.*

There were two basic components to the solicitation. OPM would lease space for its staff at an annualized square footage rate; room and food charge would depend on the number of training attendees at a set per person, per meal price. In short, only the lease rate for staff space would be guaranteed. At the pre-proposal conference on November 21, 1995, OPM representatives explained that, although OPM would be required to pay for the leased space regardless of attendance, "The service part would be based on the numbers that actually show up. And there are some guarantee provisions in the solicitation that say at a certain point we tell you roughly what the number's going to be, at another point we tell you an even closer number, and then on day one we tell you this is our guarantee for the two-week period." Def.'s App., Tab 4 at 10-11. When an attendee asked, "In the end, then, the operator does bear the risk of low attendance, provided the government has given notice of low attendance?" OPM's response was "Correct. Correct, except for the lease part." *Id.* at 11. At that conference, an OPM representative explained that there was no guaranteed occupancy level, stating, "I don't want to give you the sense that it is entirely likely that we'll have 200 rooms filled for 44 weeks a year. That's probably unlikely, but there'll be some

_____

[3]/(...continued)

> know approximately how many seminars will be held that fiscal year. This information will be communicated to the lessor so that initial plans for meals, lodging and all other amenities and services can be made. A projected estimate will be provided the lessor at least three days before the seminar begins. A final guarantee will be provided on the morning of the second day of the seminar.

*Id.*

very, very strong periods, and we need to have the capacity to deal with those strong periods when they occur in our business cycle." Def.'s App., Tab 4 at 5.

No representative of FGI or its predecessor in interest, Ken Lowe Management Company, attended the pre-proposal conference. Plaintiff's Response to Defendant's Proposed Findings of Undisputed Facts ("Pl.'s Resp. to Def.'s PFUF") at 3. Mr. Lowe reviewed a transcript of the proceedings prior to submitting FGI's proposal and testified in deposition that all his questions, including those pertaining to attendance were basically answered. *See id.* at 3-4; see also Appendix to Defendant's Motion for Summary Judgment ("Def.'s App."), Tab 12 at 91-92.

According to Lowe's Declaration, in calculating return on a significant capital investment of some $20 million (the approximate capital investment required), the two most important factors in gauging cash flow were the nightly room rate and OPM occupancy/seminar enrollment. Pl.'s App. at 83. According to FGI, since the latter estimates were given in the solicitation, the per room, per person and square footage charges were variables within FGI's control. *See id.*; see also Pl.'s Proposed Findings of Uncontroverted Facts ("Pl.'s PFUF") ¶ 3. FGI's initial proposal of December 11, 1995 was $79.00 per night with a lease rate for OPM staff space of $13.99 per square foot ($337,139 annually). *Id.* at ¶ 4; see also Def.'s App., Tab 5 at 1-2. In early February, 1996, FGI was informed its bid was in the competitive range and was asked to review its pricing "in view of this being a very competitive procurement . . . ." Pl.'s App. at 95, 98.

Prior to preparing a revised proposal, FGI requested "a more refined estimate of future attendance." Pl.'s App. at 83-84. OPM Contracting Officer Raymond D. Hesson responded on March 8, 1996 with "estimates about the future level of business," officially projecting 26,000 room nights for FY-1998 and 27,000 for FY-1999, with unofficial projected annual growth of 2% for FY-2000 through FY-2002. *Id.* at 99. Four days earlier, Mr. Hesson faxed to FGI the actual attendance figures at the Western Management Development Center ("WMDC"), the other national training center, for FY-1994 and FY-1995, i.e., 45,683 and 43,780, respectively. Pl.'s App. at 100.

Since the EMDC estimates for FY-1998 and FY-1999 were only 34% of the 53,130 room-nights in the solicitation, FGI raised its nightly room rate bid  40%, from $79.00 to $112.00. Pl.'s App. at 104; see also Pl.'s PFUF ¶ 7.

On March 19, 1996, the Contracting Officer requested that potential bidders "review the entire pricing schedule in light of it being a very competitive procurement" and submit Best and Final Offers ("BAFO"). Pl.'s App. at 105-06.

FGI's BAFO of March 20, 1996, provided that "based upon 26,000 room nights per year . . . we find it necessary to offer rooms at the cost of $99.00 per night." Pl.'s App. at 108.  FGI retained its lease rate quote of $13.99 per square foot and proposed meal pricing that would escalate during the term of the contract.  *Id.* at 107. FGI invited OPM to amend its solicitation specifications to "decrease the total of 212 rooms needed" or "assure a greater room occupancy" so that "the rate could be lowered to get closer to the original estimated $79.00 per night."  *Id.* at 108.

On April 12, 1996, OPM amended the solicitation to "show a longer base period and a lower number of participants and rooms."  Pl.'s App. at 80.  First, the amendment lengthened the base period from ten to fifteen years with only one five-year renewal option instead of the previous two.  *Id.*   Second, "[w]herever the number of participants and rooms is set forth [in the solicitation] the total estimated number of participants would be 30,500; the required number of rooms, 168."  *Id.*   The original number of room-nights, 53,130, was an estimated quantity "to be used for price comparison only."  Pl.'s App. 12-13. Third, and at the epicenter of the dispute here, the amendment contained the following provision:

> 3.   OPM intends to aggressively pursue programs that will increase attendance to the original levels set forth in the initial solicitation. Therefore, the revised pricing must take into consideration that the facility proposed may be expanded to 210 rooms within 18 months of notice from the Office of Personnel Management.

Pl.'s App. at 81.

In the cover letter accompanying this amendment, OPM wrote:

> For purposes of comparing and evaluating pricing proposals, the Government will examine the overall cost differences between offers at a participation level of 30,500, which represents an estimate based on 168 rooms at 11 nights per session for 22 cycles per year using a 75% occupancy rate.

Def.'s App., Tab 9 at 1; see also Pl.'s App. at 118.  The cover letter also contained the "intends to aggressively pursue" paragraph.  Def.'s App., Tab 9 at 1; see also Pl.'s App. at 118.

FGI's revised BAFO also included redesign of the training center and a revised room price of $79.00 per night for Years 1-7, $84.00 per night for Years 8-15, and a price to be negotiated for the option period.  Pl.'s App. at 110.  The quote for the required 24,100 square feet of leased space remained $13.99 per square foot.  *Id.*

The parties signed the contract for lease of real property on June 7, 1996.  It contained the following provision concerning escalation on food and lodging:

> The Lessor has indicated that escalation on food and lodging prices for years 1 - 15 will be in accordance with the Lessor's best and final offer dated April 22, 1996, in lieu of the escalation based upon the consumer price index, provision 4.3.3 of the SFO OPM-RFP-96-01575RDH.  Pricing for food and lodging for the option period (years 16-20) are subject to negotiation.

Def.'s App., Tab 3 at 3.

The contract also provided that "[t]he cost of food and lodging and other costs included in the schedule shall be reimbursed on an indefinite delivery, indefinite quantity basis."  Def.'s App., Tab 3 at 95.  Moreover, the contract specifies that "[t]he Government shall only be obligated to pay for the actual number of meals and lodging rooms guaranteed for each two-week seminar."  *Id.* at 96.

The EMDC facility opened in 1998 with OPM hosting its first participants late in FY-1998.  Pl.'s Resp. to Def.'s PFUF at 8-9.  FY-1999 was the first full fiscal year during which EMDC was open for business.  *Id.* at 9.

FGI complains that actual attendance has been far less than what OPM represented it would be.  See Amended Complaint ¶ 14.  The government disagrees, asserting that actual EMDC attendance has been at or near the ranges of the March 8, 1996, estimates and amendments, i.e., 25,000 to 35,000 per year.  Def.'s Mot. at 10.  The actual attendance rates at the EMDC, measured in room-nights, were the following: 26,466 (FY-1999); 24,684 (FY-2000); 26,351 (FY-2001); 29,377 (FY-2002);

28,564 (FY-2003); and 29,146[4/] (FY-2004).  Def.'s Mot. at 10; Pl.'s Resp. to Def.'s PFUF at 8; Summ. J. Tr. at 16-17.  The 2000 attendance figures were lower, the government explains, because OPM released rooms in order to accommodate the Middle East Peace Talks.  Def.'s Mot. at 10.  In response to FGI's complaint of less-than-aggressive marketing, the government counters that OPM has taken steps which have increased attendance, including hiring a full-time sales and marketing manager. *Id.* at 10-11.

FGI alleges that the government provided inaccurate information and estimates concerning actual and anticipated occupancy levels, and as a result, space at the center has not been used.  Accordingly, FGI is not receiving the revenue anticipated.  Am. Compl. ¶¶ 24-30.  FGI further contends that the government breached its obligation either to increase attendance and aggressively market to increase attendance.  FGI also asserts the government prevented the sale of unused convention and hotel space and failed to cooperate with FGI in this regard.  *Id.* ¶¶ 45-55.  Finally, FGI contends the government failed to compensate it for price increases under the contract.  *Id.* ¶¶ 61-66.  FGI seeks damages totaling $3,934,316.  *Id.* at 18.

Specifically, FGI asserts OPM did not disclose before the contract was awarded  that there was "unrelenting pressure to fill seats in order to break even or, more often, to minimize losses" at the EMDC and at the WMDC in Aurora, Colorado. See Pl.'s Br. at 6.  FGI also alleges that OPM failed to reveal that "overall seminar sales ha[d] been declining since FY 92 . . . an average annual rate of decline of around 6% per year from FY 92-95."  *Id.* at 6-7.

FGI cites from the Contracting Officer's deposition testimony, that (1) no one ever brought the attendance level information to the Contracting Officer's attention; and (2) it was information that should have been taken "into consideration."  Pl.'s App. at130-31.

FGI insists that OPM also failed to disclose several critical changes in government that would negatively impact utilization of the facility, including (1) "reinvention of government" and the resulting reduction in the federal workforce;

---

[4/] Defendant stipulated to the FY-2004 figure during the March 2, 2005 hearing for the purpose of adjudicating the motion for summary judgment, but the actual figure might actually higher by 600. Summary Judgment Transcript at 16-17.

(2) OPM's loss of its virtual monopoly position in training federal government managers; and (3) greatly relaxed training requirements for the federal workforce. *See* Amended Complaint ¶¶ 27-30; *see also* Pl.'s Br. at 9-11. Plaintiff argues that OPM kept these market realities, including information about an annual 6% to 7% attendance decline after FY-1992, hidden from plaintiff until the summer of 2001. Amended Complaint ¶ 30; Pl.'s Br. at 10.

According to FGI, OPM was anticipating a 12% reduction in the civilian workforce by 1999. Pl.'s Br. at 10-11. Also, FGI charges, OPM was "actively involved" in rule-making that "would significantly change the regulatory environment" of federal employee training by "removing 'constraints on the use of non-Government training' and 'limitations on training employees through non-Government facilities.'" *Id.* at 11-12 (quoting 61 Fed. Reg. 21947, 21048 (May 13, 1996)). Plaintiff points out that after FGI had submitted its final offer but before the contract was awarded, OPM published an Interim Rule which eliminated the distinction between government and non-government training. *Id.* at 12. The final rule was published on December 17, 1996, approximately six months after OPM awarded the contract to FGI. *Id.*

In reply to plaintiff's accusations of lack of cooperation, good faith, and hindrance, the government notes that it has, on numerous occasions, released rooms months in advance of its classes, even though not contractually obligated to do so. Def.'s Mot. at 11. For example, the government argues, at FGI's request, OPM has intentionally refrained from reserving space in early fall, thereby permitting FGI to rent out space during the lucrative fall tourist season in West Virginia. *Id.* In addition, OPM has accommodated FGI's hosting of events sponsored by other government agencies, including the 2000 Middle East Peace conference, from which FGI netted more than $500,000 in profits. *Id.* Finally, the government replies, OPM has supplied FGI with its calendar earlier than contractually required, giving FGI more time to market and plan. *Id.*

FGI also asserts that from 1996 to 2001, rather than aggressively marketing or even marketing at any significant level, OPM has simply commissioned more studies to examine the mounting attendance problems. Pl.'s Br. at 13-14. In fact, plaintiff argues, a 1996 study, done more than a year and a half prior to the July 1998 opening of the EMDC, found that without a market strategy, tactical planning, or goal-setting, training center attendance figures would be subject to "the whim of the marketplace." Pl.'s App. at 208. A 1999 study found that "OPM still had not developed a

'structured strategic planning effort.'" Pl.'s Br. at 14.  As of January 24, 2003, "the EMDC still did not have a marketing plan." *Id.* at 15.  FGI concludes that despite this awareness, and a contract requiring aggressive marketing, OPM has not.

In support for its claims that OPM has not acted in good faith, has failed to cooperate, and has hindered FGI's ability to mitigate the decreased attendance at its conference center, plaintiff complains that OPM typically reserves rooms based on the maximum capacity of classes offered, not on the actual reservations OPM receives. Pl.'s Br. at 17.  As a result, FGI is prevented from accepting other reservations for those rooms until it receives OPM's attendance roster – usually less than one week before a particular course begins, and sometimes not until the day before.  *Id.*  By then, it is difficult to market these rooms due to the hotel's remote, campus-like setting, features required by the contract.  *Id.*  According to the report of FGI's expert, non-OPM occupancy was only half of what it should have been.  Pl.'s Br. at 17; Pl.'s App. at 275.

On September 14, 2001, plaintiff submitted a claim for breach of contract and for an equitable adjustment to the Contracting Officer, seeking damages of $3,171,240. The Contracting Officer denied the claim on November 13, 2001. Pl.'s App. at 379-85.  On December 16, 2003, FGI submitted a second certified claim to the Contracting Officer seeking price escalations.  The Contracting Officer denied this claim on March 19, 2004.  *Id.*  at 386-88.  FGI filed a complaint in this court on January 25, 2002, and an amended complaint on April 2, 2004.

## Discussion

Summary judgment is appropriate ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The court must resolve all reasonable inferences in favor of the non-moving party.  *Id.* at 255.  The burden is on the moving party for summary judgment, to

demonstrate that there is no genuine issue of material fact, may be discharged if it can show ". . . that there is an absence of evidence to support the nonmoving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party to produce evidence setting forth specific facts of a genuine issue for trial. *Celotex*, 477 U.S. at 322. *Anderson*, 477 U.S. at 256, 249-50; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984)) (holding that non-movant ". . . must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial."). Instead, to create ". . . a genuine issue of fact, the nonmovant must do more than present *some* evidence on an issue it asserts is disputed." *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988).

## 1.    *Jurisdiction*

At oral argument on the pending motions, as a result of questions whether EMDC receives any appropriated funds or is fully funded from conference fees, the court, *sua sponte*, queried whether EMDC might be a non-appropriated fund instrumentality ("NAFI") and requested that this issue be briefed by April 1, 2005.

The government represented that  funds "could" be appropriated for EMDC without  statutory amendment, and that, therefore EMDC is not a NAFI. Def.'s Resp. to Ct.'s Order at 1-2. OPM has "'a revolving fund . . . for . . . training . . . , including personnel management services performed at the request of individual agencies,'" and "'[t]he capital of the fund [includes] appropriations made to provide capital for the fund, which appropriations are hereby authorized.'" *Id.* (quoting 5 U.S.C. § 1304(e)(1), (2)). Accordingly, even though a portion of EMDC's operating budget may be generated from revenue derived from other agencies, the government explains, funds could be appropriated for EMDC's benefit without statutory amendment. *Id.* at 1 (citing *AINS, Inc. v. United States*, 365 F.3d 1333 (Fed. Cir. 2004)). FGI did not file a response to the court's order.

Generally, this court lacks jurisdiction over contract claims against a NAFI such as the Federal Reserve System, the Federal Housing Finance Board, Federal Prison Industries, or the United States Mint, because the United States has not assumed the financial obligations of such entities by appropriating funds to them. *United States v.*

*Hopkins*, 427 U.S. 123 (1976); *Core Concepts of Fla., Inc. v. United States*, 327 F.3d 1331, 1335-37 (Fed. Cir. 2003); *Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed. Cir. 2001); *Denkler v. United* States, 782 F.2d 1003, 1007 (Fed. Cir. 1986). "The sine qua non of all NAFIs is apparent in their name: they do not receive appropriated funds.  As a result, all NAFIs are [G]overnment 'instrumentalities' that are at least essentially self-supporting." *AINS, Inc.*, 365 F.3d 1333, 1337 (Fed. Cir. 2004).

However, as the government points out, even though a portion of EMDC's operating budget may be generated from revenue derived from other agencies, funds could be appropriated by Congress.[5]   While OPM is financed in part through a revolving fund of payments from other agencies for professional development for federal managers and executives, a significant portion of OPM's budget is appropriated.[6]  Accordingly, OPM is not a NAFI, and this training operation lacks the clear separation from appropriated funds required to deprive the court of jurisdiction over the contract claims involved here.  *See also Lion Raisins  v. United States*, __ F.3d __, 2005 WL 1705511 (Fed. Cir. 2005).

## 2.    *Contract Disputes Act*

For the purposes of resolving the pending motions, the court accepts the parties' characterization of this lease as in the nature of a requirements contract.  Does the Contract Disputes Act ("CDA") apply?  Section 3 of the CDA "applies to any express or implied contract . . . entered into by an executive agency for the procurement of property, other than real property in being."  41 U.S.C. § 602(a)(1). The contract here includes procurement of property so the question is whether the

---

[5] At the Prepoposal Conference on November 21, 1995, Tom Dausch, "head" of the EMDC (then located in the Brunswick Hotel in Lancaster, Pennsylvania) represented that "[a]ll our funding comes from tuition that is paid to us by other federal agencies who send participants to our programs." Def.'s App., Tab 4 at 4.

[6] Out of a total budget request of almost $35 billion for FY-2005, projected payment for OPM services by other agencies was $1,026,459.  FY-2004 enacted appropriations from the General Fund were $33.3 billion.  UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, CONGRESSIONAL BUDGET JUSTIFICATION, PERFORMANCE BUDGET, FISCAL YEAR-2004, 9-18 (Feb. 2004), *available at*  http://www.opm.gov/budget/2005/2005Budget.pdf (last visited June 8, 2005).

contract is for "real property in being" and thus outside the CDA. It is not and the CDA applies.

The Federal Circuit has explained that the "real property in being" exclusion applied ". . . only to the acquisition of pre-existing interests and does not apply to contracts that create a new property interest, such as a leasehold, at the time of contracting." *Bonneville Assocs. v. United States*, 43 F.3d 649, 654 n.7 (Fed. Cir. 1994) (citing *Forman v. United States,* 767 F.2d 875, 876-79 (Fed. Cir. 1985)). Indeed, *Forman* explained the "in being" exclusion applies to contracts for:

> procurement of existing interests – fees, easements, leases, etc.– and not the initial creation of these interests . . . . A leasehold does not exist until a lease is entered into, and by entering into a lease the Government does not acquire a pre-existing interest in the land; it establishes a new one. Thus, the Policy Act's language excluding contracts to procure 'real property in being' fails to apply to newly-created lease agreements, and they fall within the purview of that statute and of the corresponding provisions of the Contract Disputes Act.

767 F.2d at 879; *see also McNabb v. United States*, 54 Fed. Cl. 759, 773-74 (2002); *Colon v. United States,* 35 Fed. Cl. 337, 339-40 (1996) (applying CDA to lease disputes where the government was the lessor).

Moreover, this was a multi-faceted solicitation for the lease by OPM of a facility to be built for EMDC both for office space for its staff, conference space for all its training programs, and food, lodging and appurtenant facilities for program attendees. 48 C.F.R. § 16.503; *see Bonneville Assocs.,* 43 F.3d at 653-54 (recognizing CDA's applicability to multi-purpose government contract that included purchase of property as well as repairs and alteration); *see also Bonneville Assocs. Ltd. v. Barram*, 165 F.3d 1360, 1362-63 (Fed. Cir. 1999).

### 3.   *Requirements Contract Estimates*

Here, the government contracted to use FGI's facility, not only for all of EMDC's administrative office space, but also for conducting all the training sessions and housing and feeding the participants. There is no other facility in the eastern district. As such (and the parties so characterize) their agreement is similar to a

"requirements" contract.  "[A] requirements contract 'calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price.'" *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1379 (Fed. Cir. 2004) (citing *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1336 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 981 (2003)).

Requirement contracts are appropriate when the government has recurring needs but cannot precisely determine the level of service needed.  48 C.F.R. § 16.503. When soliciting offers for a requirements contract, the contracting officer "shall state a realistic estimated total quantity" in the solicitation.  § 16.503(a)(1).  The estimate may be based on records of previous requirements, using the most current information available.  *Id.*

While the government set forth its intent to aggressively pursue programs to increase attendance for its training programs, neither the minium nor maximum of the magnitude of that need was specified.  Estimates are sufficient, but, those estimates must be "realistic."  48 C.F.R. § 16.503(a)(1); *see also Technical Assistance Int'l v. United States*, 150 F.3d 1369, 1371-72 (Fed. Cir. 1998).  Nevertheless, the government "must act in good faith and use reasonable care in computing its estimated needs."  *Rumsfeld*, 325 F.3d at 1335.  If a contractor can show by a preponderance of the evidence that the government prepared estimates "inadequately or negligently," "not in good faith," or "grossly or unreasonably inadequate" at the time, the government could be liable for damages.  *Id.* (quoting *Clearwater Forest Indus., Inc. v. United States*, 227 Ct. Cl. 386, 395 (1981)).  Absent negligence or bad faith, the contractor bears the risk of variance between the estimated and actual contract quantities.  *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992).

In computing estimates for contract solicitations, the government is  permitted to base its figures on ". . . records of previous requirements and consumption . . . ." *Medart*, 967 F.2d at 581 (quoting 48 C.F.R. § 16.503(a)(1)).  In *Medart*, the General Services Administration ("GSA") issued a solicitation for bids for a requirements contract to supply metal storage and wardrobe cabinets.  *Id.* at 580.  The estimated quantities were based on the number of units ordered during the most current previous twelve-month period available.  *Id.*  Those estimates deviated significantly from the actual numbers needed by between 24% and 70% in the various categories of cabinets. *Id.*  The cabinet supplier filed a claim with the contracting officer alleging damage from

the faulty estimates which the contracting officer denied. *Id.* The GSA Board of Contract Appeals upheld the contracting officer's decision. *Id*. at 581. The Federal Circuit, in turn, affirmed the decision of the GSA Board, finding the government used a permitted method to estimate its needs. *Id.* at 582. The Federal Circuit held that, while the government could have used superior estimating methods, it was not obliged to do so. Accordingly, the contractor bore the risk of variances in quantity required. *Id.*

In *Rumsfeld*, the Defense Logistics Agency ("DLA") issued a request for proposals ("RFP") for a requirements contract to supply refrigerant storage cylinders. *Rumsfeld*, 325 F.3d at 1330-31. Based on existing inventories at the time and predicted need, DLA estimated that it would require 120,000 cylinders during the contract year, with a variation of plus or minus 3%. *Id.* at 1331. After receiving the bids, but before awarding the contract, DLA became aware that its actual needs would, in fact, be between 5% and 10% of the quantity estimated in the RFP, but did not inform the bidders of this information. *Id.* at 1331-32, 1334. DLA terminated the contract for convenience when the parties were not able to agree to modify the contract. *Id.* at 1332. While the contracting officer denied the supplier's claims for breach of contract based on faulty estimates, the Armed Services Board of Contract Appeals, citing *Womack v. United States*, 182 Ct. Cl. 399, 389 F.2d 793 (1968), held that DLA was negligent in preparing its estimates and that the negligent estimates constituted a breach of contract entitling the contractor to compensatory damages. The Federal Circuit affirmed, holding that the DLA had a duty to inform the successful bidder that orders would be significantly below the RFP estimates. Negligently prepared estimates can constitute a breach of contract.

> [W]here a contractor can show by preponderant evidence that estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made,' the government could be liable for appropriate damages resulting. Accordingly, to the extent that a government estimate is inadequately or negligently prepared, its inclusion without correction in a solicitation or contract constitutes a misrepresentation that, whether deliberate or unintentional, amounts to a breach of contract.

325 F.3d at 1335 (citations omitted).

*Womack* was a case involving a breach of contract claim arising out of a large program to revise and modernize records of public lands administered by the Bureau of Land Management. *Womack v. United States*, 182 Ct. Cl. 399, 401 (1968). Prior to awarding a contract for indexing records in Utah, the government told the plaintiffs that they would be processing approximately 65,000 records. *Id.* at 404. The actual number turned out to be 105,000, over 60% higher than the estimate. *Id.* at 408. While "the Government is not required to be clairvoyant. . . it is obliged to base [its] estimates on all relevant information that is reasonably available to it." *Id.* at 412-13.

The Court of Federal Claims reached a similar conclusion on facts similar to those in *Womack*. In *Crown Laundry*, the Redstone Arsenal solicited bids for a requirements contract to provide laundry and dry cleaning services to the arsenal. *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506, 509-10 (1993). In calculating its estimated needs, arsenal management officials queried various management units, but did not examine records of actual laundry and dry cleaning services used under the contract then in existence. *Id.* at 510-11. The estimates given in the contract were 45% above actual need. *Id.* at 513, 520. Finding that the government did not attempt to verify the estimates it received from the various management units, did not attempt to update them to the most recent data period, and actually suspected that the figures were overstated, the court held that the estimates were not reasonable, the contract was breached and compensatory damages were awarded. *Id.* at 521, 523.

The common threads in the cases where courts have found estimates to be unreasonable are actual knowledge that the estimates were inaccurate or failure to take reasonable efforts to confirm doubtful estimates. Here, the government denied any guaranteed minimum and the estimates given were not inconsistent with subsequent actual attendance.

At the pre-proposal meeting on November 21, 1995, in response to a question as to whether the lease would require a minimum number of rooms, the answer was "no." A follow-up question asked, "Will OPM be willing to negotiate a minimum number of rooms per night guaranteed prior to or during the contract negotiation phase? Mr. Dausch: I'm understanding that question as being a guarantee of number of room nights throughout the course of the contract, and I don't think we will be able to do that." Def.'s App., Tab 4 at 16.

On March 8, 1996, the Contracting Officer sent plaintiff a letter noting the continuing environment of "Government restructuring and downsizing," and shared its EMDC attendance estimates for FY-1998 and FY-1999 of 26,000 and 27,000 room-nights, respectively.  Pl.'s App. at 99.  Beyond that, the letter continued, OPM projected additional attendance growth of 2% annually for FY-2000 through FY-2002. *Id.*  In another letter, dated April 12, 1996, the contracting officer informed plaintiff that, based on then current participation levels, the number of attendees would range between 25,000 and 35,000 room nights annually, which would require only 168 rooms instead of the originally touted 210.  *Id.* at 118.  The government, solicited new bids and advised that it would be analyzing offers based on a participation level of 30,500 room nights, representing a 75% occupancy rate of 168 rooms during twenty-two eleven-night training cycles annually,[2/] but wanted the ability to accommodate more participants with eighteen months notice.  *Id.*  The change was incorporated into the solicitation as an amendment.  *Id.* at 79-81.

Instead of the 25,000 to 35,000 participant estimate, plaintiff asserts the 30,500 figure from the contract amendment was a floor, with a ceiling of 53,130, a figure that plaintiff derives from what it alleges was OPM's initial estimate that EMDC would host 210 participants for twenty-three two-week cycles of five training courses per cycle. Pl.'s Br. at 3, 4, 6, 8.  Plaintiff also argues that OPM's duty to aggressively market would have resulted in the higher figure.  *Id.* at 6.  The original estimate of 53,130 did not remain the contract.  However, as noted earlier, the 30,500 number, like the 53,130 quantity, was a "quantity estimate to be used for price comparison only."  Pl.'s App. at 12-13 and 79-81 and Def.'s App., Tab 9.

Plaintiff has failed to proffer any material fact that could demonstrate that these occupancy figures were calculated in an inadequate, negligent, or unreasonable manner, or in bad faith.  Plaintiff alleges merely that "OPM's occupancy estimates for the EMDC changed greatly during the pre-award phases of this procurement . . . ." Pl.'s Br. at 26-28.  Plaintiff asserts that there is no basis for the estimates used by the and hints that they were "simply pulled . . . out of the air."  *Id.* at 28 n.13.

The estimates the government provided are not inconsistent with actual occupancy rates and OPM representatives specifically disclosed in pre-bid conference that the risk of attendance was with the successful bidder.  In all but one year, however,

---

[2/] This calculation results exactly in 30,492 room nights annually.

the actual attendance was within (albeit on the lower end of the range) the 25,000 to 35,000 band estimated by OPM in pre-bid correspondence, a band which was based on prior attendance figures.  The single deviation is FY-2000, where actual attendance was 24,684, a figure only 316 below the 25,000 estimated minimum attendance, a discrepancy of slightly more than 1%.  *See* Def.'s Mot. at 10.  In all cases however, actual attendance fell below the contract's 30,500-participant estimate by between 4% and 19%.  This difference is not the tenfold overestimate of *Rumsfeld*, the 40% underestimate in *Womack*, or the 45% overestimate in *Crown Laundry*.  Although the 25,000 to 35,000 figures are not in the contract, they were known to plaintiff before it bid, as were the specific estimates for EMDC of 26,000 and 27,000 participants in FY-1998 and FY-1999, respectively, the latter of which was only 2% over the actual attendance of 26,466.

Moreover, unlike *Rumsfeld*, this is not a case where the government knew that its estimates were wrong prior to bidding and failed to tell plaintiff.  Although plaintiff alleges that the government knew that attendance was declining at the WMDC, *see* Pl.'s Br. at 20; Pl.'s App. at 100-01, OPM actually shared the FY-1994 and FY-1995 WMDC attendance figures, the most recent years available, with plaintiff before plaintiff bid.  Pl.'s App. at 100.

The only warranty given in the contract is the guaranteed attendance figure in § 4.3.1 that OPM promises to provide to plaintiff on the morning of the second day of each seminar which defines the minimum level of payment.  Def.'s App., Tab 3 at 29-30.  The risk is otherwise on the bidder, in the absence of a showing that the government made its estimates in an inadequate, negligent, or unreasonable manner, or in bad faith.  Since plaintiff has proffered no such evidence, the court must dismiss its allegation that the estimates were negligent.

## 4.   *Superior Knowledge*

In addition to negligent estimates, FGI asserts the government made misrepresentations and failed to disclose material facts, particularly the anticipated number of enrollees and/or failed to disclose relevant facts that numbers had been declining at the comparably sized WMDC in Aurora, Colorado.  FGI also avers that the government had superior knowledge that (1) the federal workforce was declining by between 11% and 14% under the Federal Workforce Restructuring Act of 1994 ("FWRA"); (2) OPM was losing "its virtual monopoly position with respect to training

the [F]ederal workforce," and (3) training requirements were relaxed under proposed training rules that would reduce training for cost-reduction purposes, with the effect that employees who might otherwise have been trained would no longer need to receive any training. FGI also alleges that OPM withheld the fact that OPM had "lost money for over ten years on its training programs." Amended Cmp. ¶¶ 27-30.

The following material facts in this regard are not in dispute. In OPM's March 8, 1996, letter responding to an inquiry by Kenneth Lowe, FGI's principal concerning attendance level, the government stated that, "especially during these times of Government restructuring and downsizing," its best estimates for FY-1998 and FY-1999 were 26,000 and 27,000 participant nights respectively, with 2% growth thereafter. Def.'s App., Tab 6. The cover letter to amendment 2 to the solicitation stated that (1) bids would be considered based upon an estimated 30,500 participant nights, and (2) projections ranged from between 25,000 and 35,000 per year. *Id.*, Tab 9.

As noted *supra*, actual participant nights at the EMDC have been the following: 26,466 (FY-1999); 24,684 (FY-2000); 26,351 (FY-2001); 29,377 (FY-2002); 28,564 (FY-2003); and 29,146 (FY-2004). Def.'s Mot. at 10; Pl.'s Resp. to Def.'s PFUF at 8; Summ. J. Tr. at 16-17.

FGI has proffered as evidence of the government's superior knowledge of declining training enrollments the alleged fact that the government's pre-contract representation that attendance at the WMDC was 43,780 participant nights was "dead wrong." Pl.'s Br. at 5 n.2 (citing Pl.'s App. at 100, 165). Plaintiff argues instead that the actual number of participant nights at WMDC in FY-1995 was 30,364, not 43,780.[8] *Id.* Plaintiff seems to have made its own calculation to produce this figure, instead of introducing it as evidence through witness testimony or by affidavits.

Under the "superior knowledge doctrine," a contracting agency has an implied duty to disclose to a contractor "otherwise unavailable information" of novel matter

---

[8] Plaintiff does not explain the methodology by which it arrives at this alternate figure, but it appears that plaintiff performed the following calculation, using data from the "Denver location": (2,519 x 11) + (531 x 5) = 30,364. *See* Pl.'s App. at 165. If that formula is correct, then defendant's FY-1994 WMDC figures are also wrong, and should be 29,441 instead of 45,683: (2,601 x 11) + (166 x 5) = 29,441. *See id.* at 164. Plaintiff, however, does not make this latter claim.

vital to the performance of the contract where (1) "a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration;" (2) "the government was aware the contractor had no knowledge of and had no reason to obtain such information;" (3) "any contract specification supplied misled the contractor or did not put it on notice to inquire;" and (4) the government failed to provide the relevant information." *Giesler v. United States*, 232 F.3d 864, 866 (Fed. Cir. 2000) (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)); *Petrochem Servs., Inc. v. United States*, 837 F.2d 1076, 1079 (Fed. Cir. 1988) (quoting *Am. Shipbuilding Co. v. United States*, 228 Ct. Cl. 220, 225 (1981)). The government, however, "is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere." *H. N. Bailey & Assocs. v. United States*, 196 Ct. Cl. 166, 178 (1971) (citations omitted).

The FWRA mandated that the number of full-time equivalent ("FTE") positions in all federal government agencies would not exceed 2,084,600 in FY-1994, and that this FTE ceiling would decrease through 1999 until it reached 1,882,300 in FY-1999, a decline of 9.7%. See Fed. Workforce Restructuring Act of 1994, Pub. L. No. 103-226 § 5(b), 108 Stat. 111, 116 (1994).

Similarly, OPM's interim training regulations, which were promulgated to implement the FWRA, and which plaintiff cites in its amended complaint, noted that the FWRA enacted certain recommendations of the 1993 National Performance Review to streamline the Federal bureaucracy. 61 Fed. Reg. 21947. The regulations informed that the distinction between government and non-government training had been eliminated by 5 U.S.C. § 4105 "to make training more market driven." *Id.* They also gave notice that 5 C.F.R. § 410.204 was being updated to give agencies authority to meet training needs by a variety of non-classroom methods, including technology-based training, on-the-job training, rotational assignments, and mentoring, to name a few. *Id.* In short, federal training centers were no longer the only game in town.

This legislative and regulatory activity was no secret. It is a classic legal maxim that "ignorance of the law is no excuse." *See,* e.g., *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409, 416 (2003) (citations omitted), *rev'd on other grounds sub nom. Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005). In particular, "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Fed. Crop Ins. Corp. v. Merrill,*

332 U.S. 380, 384-85 (1947); *see also* 44 U.S.C. § 1507 ("Unless otherwise specifically provided by statute, filing of a document [in the Federal Register] . . . is sufficient to give notice of the contents of the document to a person subject to or affected by it.") and *Higashi v. United States*, 225 F.3d 1343, 1349 (Fed. Cir. 2000). Thus, plaintiff is charged with notice of both the FWRA and the interim training regulations which, taken together, posited a smaller Federal bureaucracy and a more competitive Federal training environment.

To succeed in its argument that the government possessed superior knowledge, plaintiff must show that information about some novel matter that was vital to the performance of the contract was "otherwise unavailable," and that the government knew that the contractor was unaware of this information. *Giesler*, 232 F.3d at 876. As stated *supra*, however, the government has no duty to volunteer readily available information. *Bailey*, 196 Ct. Cl. at 178.

Congress passed the FWRA on March 30, 1994. OPM promulgated interim training regulations on May 13, 1996. The parties signed the contract on June 7, 1996. Even assuming, *arguendo*, that plaintiff somehow avoided gaining knowledge in the early to mid-1990s about government reinvention, restructuring, and streamlining, despite being informed by OPM of government downsizing in response to FGI's request for better attendance estimates (*see* Def.'s App., Tab 6, DFFUF ¶ 10 to which plaintiff voiced no objection, and FGI's letter to a mortgage lender referring to government downsizing, Def.'s App., Tab 11), plaintiff clearly had constructive notice by means of the FWRA and interim training regulations that the number of civilian employees was in decline and that the remaining workers would have a variety of training options available.[2/] The contracting officer denied plaintiff's claim of superior knowledge for the exact same reason in 2001, App. to Pl.'s Br. ("Pl.'s App.") at 380. Therefore, plaintiff cannot claim that defendant had superior knowledge of government downsizing or regulatory changes.

A different question arises, however, with respect to plaintiff's claim that the government failed to share its awareness of attendance problems at the training centers. Several cases set forth the superior knowledge rule.

---

[2/] Plaintiff's CEO admits to having actual notice of these trends, too, although he denied knowing the specifics. Pl.'s App. at 90.

In an early case, the United States Navy solicited bids to build a radio communications facility in western Australia. *Hardeman-Monier-Hutcherson, Joint Venture v. United States*, 198 Ct. Cl. 472, 475 (1972). The remote site required construction of a pier to unload supplies. *Id.* The Australian government took soundings of the potential pier sites on behalf of the Navy and reported non-obvious information about the Navy's pier preferred site that precluded its suitability, including strong currents and high winds. *Id.* at 477. Notwithstanding the report, the Navy chose the unsuitable site as the site for the pier. *Id.* A second survey, conducted before the submission of construction bids, confirmed the earlier report. *Id.* at 477-78. The invitation for bids did not mention the site problems. *Id.* at 479. Plaintiff learned about the survey reports before bidding, but was unable to obtain copies, and submitted its bid without knowledge of the contents of the reports. *Id.* at 480. Noting that when the government possesses superior knowledge, "[i]t cannot remain silent with impunity," the court held that the government had a duty to disclose and share its superior knowledge of the sea conditions and that its failure to do so was a breach of contract. *Id.* at 487-88.

Here, plaintiff has proffered evidence that the government was aware of a critical fall in attendance at its training centers. Pl.'s App. at 121 (undated memo referencing an April 5, 1996 memo request), 124 (memorandum for FY 97 citing declining seminar sales since FY 92 and questioning whether the Centers would survive past 1998), 184. Some of the evidence plaintiff cites includes reports apparently produced after the contract was signed on June 7, 1996, *see, e.g., id.* at 185, 187-89, but when the government knew of the attendance declines and when they shared this information is a matter best left for trial.

Plaintiff's entitlement to non-negligent estimates in this requirements contract is not co-extensive with its right to disclosure of the government's superior knowledge. Actual OPM occupancy has not been outside the represented range. Nevertheless, FGI is entitled to pursue its allegations it would have responded differently had it known the matters it now cites.

## 5.   *Misrepresentation*

The government is liable for damages for misrepresentations in contract documents. *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 729 (Fed. Cir. 1997) (citations omitted).  A misrepresentation is merely "an assertion that is not in accord with the facts."   RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981).  No intent to deceive is required. *First Interstate Bank of Billings v. United States*, 61 F.3d 876, 880 (Fed. Cir. 1995) (citing *Womack v. United States*, 182 Ct. Cl. 399, 411 (1968)). "In order for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." *T. Brown Constructors*, 132 F.3d at 729 (citations omitted).  A misrepresentation is material "if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 162 (1979)).

"An assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation," not to future events.   RESTATEMENT (SECOND) OF CONTRACTS § 159 cmt. c. (1981).  "An assertion limited to future events may be a basis for liability for breach of contract, but not of relief for misrepresentation." *Id.*   Nevertheless, a "person's state of mind is a fact, and an assertion as to one's . . . intention, including an intention to perform a promise, is a misrepresentation if the state of mind is other than as asserted." *Id.* § 159 cmt. d.  For a statement of intention to constitute a misrepresentation, the statement of intention must be false at the time made. *See id.* § 171 cmt. a.

Plaintiff alleges two acts of misrepresentation: (1) that OPM told potential offerors, including plaintiff, at a pre-proposal conference on November 21, 1995 that approximately 80% of the conference spaces were "pre-sold," which was incorrect since plaintiff deduces that such a figure would have resulted necessarily in a minimum of 32,500 room-nights annually, and (2) that OPM promised that it would aggressively market the training program, but failed to do so.

Regarding the latter claim, plaintiff has produced no evidence that defendant lacked the intention, at the time of the execution of the contract, to market the training programs aggressively.  All of the acts or omissions that allegedly constituted failures to market the programs aggressively, as detailed in plaintiff's motion, occurred after

the contract was signed.  While these acts or omissions may constitute breaches of the contract, they do not demonstrate that OPM misrepresented its intentions when it signed the contract.

In reference to the first claim of misrepresentation, that defendant falsely stated that 80% of its classroom spaces were "pre-sold," the problem is that plaintiff reads this quote out of context.  The entire quote, derived from plaintiff's own submission, is the following:

> We are a business operation.  All of our funding comes from tuition that is paid to us by other federal agencies who send participants to our programs.  In August of each year, we go through what we call an advanced sales process, and by the end of August, we have a pretty good picture about what our attendance will be for the coming year.  Roughly 80 percent of our spaces are pre-sold, our year beginning on October 1, so we're able to give the vendor a pretty good picture of how the program will be filled during the course of the year.

Pl.'s App. at 136 (quoting Tom Dausch, EMDC head).  Shortly thereafter, in answer to a question, Dausch says, "[O]ur advanced sales in August will let you know roughly 80 percent of what we're expecting for the coming year."  *Id.* at 143.  A questioner then asks, "In the end, then, the operator does bear the risk of low attendance, provided the government has given notice of low attendance?"  *Id.*  Dausch replies that the questioner is correct, "except for the lease part."  *Id.*  The questioner follows up by asking, "So ultimately, in a cancellation situation, you would give advanced notice of very low attendance, like zero.  So the real liability ends up being for the conference space."  *Id.*  Dausch again tells the questioner that he is correct.  *Id.*

Although plaintiff has chosen to read Dausch's statement as 80% of the 200 to 210 rooms OPM sought at the time of the original solicitation, the better reading clearly is that by August in any year, whatever the total number of room-nights would be for the upcoming fiscal year, EMDC would be able to predict 80% of that number, even if that total number turned out to be zero.  As such, the statement is not a misrepresentation.

- 24 -

Thus, as a matter of law, defendant did not misrepresent any material facts that plaintiff reasonably relied on to its detriment and the claim of misrepresentation in Count III must be dismissed on summary judgment.

**6.      Breach of Duty to Market Aggressively**

Count V of plaintiff's amended complaint alleges that OPM breached its obligation to "aggressively pursue programs that would increase attendance."

The contract, as amended, states the following in relevant part:

> OPM intends to aggressively pursue programs that will increase attendance to the original levels set forth in the initial solicitation.  Therefore, the revised pricing must take into consideration that the facility proposed may be expanded to 210 rooms within 18 months of notice from the Office of Personnel Management.

Def.'s App., Tab 3 at 12.  The original solicitation had projected a maximum of 53,130 participant-nights requiring 210 rooms.  Def.'s App., Tab 9 at 1.

Defendant argues that this provision states an aspirational goal, not a legal obligation to increase attendance to 53,100 annual room-nights.  At best, defendant argues, the language of the amendment was merely a statement of intent that lacked legal force.  Defendant cites two cases to support its position: *Barseback Kraft AB v. United States*, 121 F.3d 1475 (Fed. Cir. 1997) and *Estate of Bogley v. United States*, 206 Ct. Cl. 695 (1975).  This reliance, however, is misplaced.

*Bogley* merely states the obvious that "[a]n expression of intention is not an offer." 206 Ct. Cl. at 705.  Two sentences were construed in *Barseback:* "DOE intends to serve as a reliable long-term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation;" and "DOE desires to operate the enrichment complex on a sound business basis without Government subsidy." *Barseback*, 121 F.3d at 1481. By their plain terms, the previous two statements are merely aspirational, but that is not the case with the amendment to the contract now before the court.  OPM amended the solicitation to lower the prospective number of attendees, while preserving the

flexibility to increase attendance.  As such, the language expressing OPM's intention to pursue programs aggressively to increase attendance can be read as consideration for acceptance of lower attendance rates.  Thus, the language of the amendment, *supra*, is not merely aspirational, but states a legal obligation.

Furthermore, in *Barseback*, the phrases concerning intent were in the recitals and were not binding commitments.  121 F.3d at 1481.  *See Blackstone Consulting Inc. v. United States*, 65 Fed. Cl. 463, 470 (2005) and *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 77 (1996), *aff'd*, 108 F.3d 1393 (Fed. Cir. 1997) ("Whereas" clauses are generally not considered contractual).  Here the expression of intent to aggressively market to attain a specific market target was a substantive contract amendment.

Plaintiff has raised numerous examples of defendant's alleged failure to market the training programs, e.g., OPM's alleged failure to develop a "strategic planning effort" as late as November, 2000; OPM's alleged failure to foster team spirit in the training sales force, and OPM's alleged failure to even offer the full number of courses (four 2-week courses each cycle for 22 cycles) it had proposed to offer.  Pl.'s Br. at 32-35.  In sum, it appears there are numerous factual disputes on this question, thus, precluding summary judgment.  While there is evidence of marketing efforts, there is also evidence proffered to the contrary.  Accordingly, it is inappropriate, at this juncture, for the court to weigh this evidence, and the government's motion in this regard is denied.

## 7.     *Interference and Failure to Cooperate*

Plaintiff alleges in Count VI that OPM interfered with plaintiff's efforts to market rooms that would not be needed for training.  In Count VII, plaintiff avers that OPM caused it injury by failing to aggressively pursue efforts to increase attendance, by failing to provide good faith estimates, by failing to work cooperatively with plaintiff to solve problems, and by improperly administering the contract.

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d

1283, 1304 (Fed. Cir. 2005) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)).

Plaintiff alleges that OPM does not provide the actual number of participants to plaintiff until "just one week prior to the time a conference is to begin, and does not guarantee any number until the first day of the session," which interferes with plaintiff's ability to rent the rooms to the general public and, thus, to mitigate its damages. Section 4.3.1 of the contract, however, clearly states that a projected estimate of attendance would be provided to plaintiff at least three days before the beginning of a seminar, but that a final guarantee would be provided only on the morning of the second day of the seminar. Def.'s App., Tab 3 at 29; *see also* n.3, *supra*. That section also states:

> Generally, from the projected estimate [provided 3 days before the seminar begins] to the final guarantee [provided on the morning of the second day of the seminar], the differences will be no greater than 5 percent over or under. The guarantee will define the minimum level of payment. Daily requirements above the initial biweekly guarantee level, for last-minute guest, will be communicated at least 24-hours in advance and will be compensated at the agreed upon food and lodging prices (also subject to above).

Def.'s App., Tab 3 at 29-30. *But see* Def.'s App., Tab 3 at 96 ("At lease [sic] one week prior to the scheduled activity, OPM will notify the lessor of the number of participants, guests, visiting faculty, etc., expected for each seminar.")

Under the plain terms of the contract, defendant has no duty to release rooms early for plaintiff's benefit. Plaintiff otherwise alleges no acts that would constitute lack of good faith or failure to cooperate. As a result, plaintiff's Counts VI and VII must be dismissed.

## 8.   *Annual Economic Price Adjustment*

OPM, in a letter dated April 12, 1996, stated that price proposal revisions would be more attractive if they did not include escalations other than the economic price adjustment provisions contained in the solicitation. Accordingly, it would be

"understood that the prices for years 2 through the balance of the program are subject to economic price adjustment."  Def.'s App., Tab 9 at 2.

By letter dated April 22, 1996, FGI submitted a new best and final offer which included the following meal pricing:

| | | |
|---|---|---|
| Years 1-5 | Breakfast . . . . . . . . | $ 6.00 |
| | Lunch . . . . . . . . . . . | $ 7.00 |
| | Dinner . . . . . . . . . . | $13.00 |
| | Box Lunches . . . . . | $ 5.00 |
| Years 6-10 | Breakfast . . . . . . . . | $ 7.00 |
| | Lunch . . . . . . . . . . . | $ 8.00 |
| | Dinner . . . . . . . . . . | $16.00 |
| | Box Lunches . . . . . | $ 6.00 |
| Years 11-15 | Breakfast . . . . . . . . | $ 8.00 |
| | Lunch . . . . . . . . . . . | $ 9.00 |
| | Dinner . . . . . . . . . . | $18.00 |
| | Box Lunches . . . . . | $ 7.00 |

Pl.'s App. at 109.

Section 4.3.3 of the solicitation provided for economic price adjustment for general maintenance, operation, and services, beginning with the second operational year, that would be no higher than the percent of change in the Cost of Living Index. Pl.'s App. at 10.  Plaintiff, however, in submitting its best and final offer, offered a specific price schedule for lodging and food service during different operational years. *Id.* at 109-10.  Plaintiff's offer was accepted and added to the contract as follows:

> The Lessor has indicated that escalation on food and lodging prices for years 1 - 15 will be in accordance with the Lessor's best and final offer dated April 22, 1996, in lieu of the escalation based upon the consumer price index provision 4.3.3 of the SFO OPM-RFP-96-01575RDH. Pricing for food and lodging for the option period (years 16 - 20) are subject to negotiation.

Def.'s App., Tab 3 at 3.  Plaintiff argues that its best and final offer was "submitted in regards to the request for best and final bids," and that since the contract

incorporated the best and final offer, it also incorporated the contracting officer's assumption that years two through the balance of the program would be subject to price adjustment under the contract.  Pl.'s Br. at 40-42; Pl.'s App. at 109; Def.'s App., Tab 3 at 3.

"A contract is read in accordance with its express terms and the plain meaning thereof."  *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) (citations omitted).  "If the provisions are clear and unambiguous, a court will give them their plain and ordinary meaning and will not resort to parol evidence." *Wright Runstad Props. Ltd. P'ship v. United States*, 40 Fed. Cl. 820, 824 (1998) (quoting *Barseback*, 121 F.3d at 1479); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face") (citing *SCM Corp. v. United States*, 230 Ct. Cl. 199, 206 (1982)).

The contract clearly indicates that escalation of food and lodging prices will be "in accordance with [plaintiff's] best and final offer dated April 22, 1996, ***in lieu of*** the escalation based upon the consumer price index, provision 4.3.3 of the SFO OPM-RFP-96-01575RDH."  Def.'s App., Tab 3 at 3, 30 (emphasis added).  The phrase "in lieu of" means "instead of," "in place of," or "in substitution of."  BLACK'S LAW DICTIONARY 787 (6th ed. 1990).  "It does not mean 'in addition to.'"  *Glassman Const. Co. v. Baltimore Brick Co.*, 228 A.2d 472, 474 (Md. 1967) (citations omitted).

Plaintiff's claim for equitable adjustment based on price escalation, therefore, must be dismissed.  The signed contract specifically excluded the previous reservation/assumption that the escalation clause would carry through.  It is well-established that the specific governs the general; the contract language, as well as the specific exclusion of the escalation clause, compels the result here.  *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854, 859 (Fed. Cir. 1997).  As a result, defendant's motion for summary judgment must be granted with respect to Count VIII of the amended complaint.

### Conclusion

For the reasons stated above, plaintiff's cross-motion for summary judgment is **DENIED**.  Defendant's motion for summary judgment is **GRANTED** as to Counts II through IV and VI through VIII of the amended complaint, but is **DENIED** as to Counts I and V of the amended complaint, the claims that defendant failed to share superior knowledge of attendance data and that defendant breached its duty to market aggressively the training programs, respectively.

Counsel shall confer and, on or before **September 12, 2005**, file a status report setting forth a proposed schedule for the further proceedings required to obtain the resolution of this litigation.

IT IS SO ORDERED.


s/ James F. Merow
James F. Merow
Senior Judge